[No. 31469.   Department One.   December 7, 1950.]

THE STATE OF WASHINGTON, *Respondent,* v. RAYMOND LEWIS, *Appellant.*[1]

*H. Earl Davis,* for appellant.

*Delbert R. Scoles* and *Daniel L. Collins,* for respondent.

DONWORTH, J.—The defendant, Raymond Lewis, was, by information filed in the superior court for Stevens county, charged with the crime of manslaughter as follows:

[1]Reported in 225 P. (2d) 428.

"That the said defendant, Raymond Lewis, on or about the 30th day of October, 1949, in the County of Stevens, State of Washington, then and there being, did then and there wilfully, unlawfully and feloniously, while hunting game, and without using ordinary caution in that the defendant knew or should have known that other human beings were in his close vicinity, and without keeping a proper lookout for other human beings, did shoot a rifle so that the bullet from said rifle went into the body of Violet Packer, a human being, thereby inflicting a mortal wound in the body of the said Violet Packer, from which mortal wound the said Violet Packer did on or about the said 30th day of October, 1949, die, and that the killing of said Violet Packer as aforesaid was neither excusable nor justifiable, all of which acts on the part of said defendant were contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State of Washington."

Upon arraignment the defendant pleaded not guilty.

A trial to a jury resulted in a verdict of guilty. After denying defendant's motions for a new trial and in arrest of judgment, the trial court entered judgment sentencing the defendant to confinement for a maximum term of not more than twenty years in the state penitentiary. The defendant has appealed to this court.

The circumstances surrounding this fatal accident are as follows:

Appellant, a resident of Spokane, had a hunting license and a doe permit entitling him to hunt for deer in Stevens county. He was an experienced hunter having hunted in this state for some twenty-seven years and was familiar with the area involved in this case.

On the date specified in the information appellant was a member of a hunting party which was hunting just north of the Haverland Meadows in Stevens county. He was aware that there was another hunting party (of which the deceased was a member) which was also hunting in the same locality. Appellant began to hunt about six-thirty a.m., which was within the permissible hours for hunting. His party separated after agreeing to meet at an abandoned mill and appellant walked up to a rocky ledge, the elevation

of which was about forty feet above the place where he had seen a deer the previous week.

Appellant testified as to what then occurred:

"A. Well, there is a draw that comes down northeast by this point, and then there is a knoll there, and there is another draw comes down in a practically easterly direction. There is more or less just a little knoll with a draw on each side. Q. And when you got within whatever number of feet you were from the face of this cliff, what did you hear or see? A. Well, I was about twenty or thirty feet back from the edge of this cliff and I heard the brush break down in there and it sounded just like a deer giving a couple of bounds when it would get up, because I heard just a couple of bounces at the break of the brush and I thought, well, there is a deer coming out, so I backed up a little to watch this open place back this side of the trees that they speak about, and I was watching back there and I was watching this open place for a deer to come out, and I didn't see no deer come out so I started to look back down through the bushes, and when I did I seen a deer's head, what I thought, come up, just the outline come up in the edge of this brush, and I pulled up my gun and pulled down on it and was going to shoot, and I shot at a deer's head right on up this ridge the Sunday before, so I didn't shoot, I pulled my gun down and was looking to find the outline of the body of the deer. Q. You have to compete with this truck. Will you keep your voice up? A. So I pulled my gun down and was watching, and at the same time I heard some more brush break and I looked around there and I looked back, and when I looked back there I seen a flick of white and I heard this noise, and I thought the deer had turned around. When I seen this flick I thought that was the deer's tail and I thought— Q. So there was some time elapsed. You didn't come up there and pull your gun up immediately, but you waited until you saw what you determined to be a deer's tail, is that right? A. Yes, sir. . . . MR. DAVIS: Q. After you shot, did you see a man somewhere in the near vicinity there? A. Yes. Q. And you left, did you? A. Yes. Q. Where did you go? A. Well, after I shot I heard a scream about a minute or so after that and I became so frightened and panic stricken that I didn't know what—I thought some accident might have happened but I thought, how could a thing like that happen? and I got panicky and took off up this long ridge that runs back on this side. I

started back up there, and I had went about fifty yards and that was open ground and there was a man on this knoll I was speaking about to my left going up,—there was a man there on open ground, and he hesitated to stop and I hesitated to stop and we both went on. Q. And you did go back and meet your party at the sawdust pile or the old mill? A. Yes. Q. And you didn't say anything until that evening, is that right—or the next evening? A. The next evening. Q. And then you did call Mr. Oxreider and Mr. Hall? A. Yes, sir. Q. As has been testified here, and did go to the sheriff's office? A. Yes."

The evidence showed that the bullet from appellant's gun struck Mrs. Packer severing an artery and causing death almost immediately. The distance from the ledge where appellant was standing when he fired his gun to the place where Mrs. Packer fell was 106.3 feet, measured in a direct line. The time of the shooting was fixed by several witnesses at about six-fifty a.m.

After the accident, appellant and his party drove to another hunting area about twenty miles distant where they hunted the rest of the day. Although one member of the party knew that Mrs. Packer had been killed and told his companions about it, appellant did not mention his possible connection with her death until the following evening. He then called his companions together and they discussed with him what he should do. As a result of their advice, appellant immediately went to the sheriff's office in Spokane and reported the matter. On the following day he signed a statement in the presence of the prosecuting attorney and sheriff of Stevens county in which he admitted firing the fatal shot.

No contention is made by appellant that the evidence was insufficient to warrant the jury in finding that the act charged in the information was committed by him. No exceptions were taken to any of the instructions given by the court to the jury.

Six errors are assigned but in considering the first three we dispose of all of them, since the legal principles involved are the same. The first three are stated by appellant as follows:

"I

"The court erred in refusing to permit the witness George Oxreider, Sr., to testify from his experience that the defendant was careful as a hunter and in the use of a gun, and in denying defendant's offer of proof with reference thereto.

"II

"The court erred in communicating with the jury after the case had been submitted to it for decision and during its deliberations, in the absence of the defendant.

"III

"The court erred in failing to have the jury returned into open court for further instructions clarifying Instruction No. 9 given by the court, when requested to do so by the jury."

Referring to the first assignment of error, appellant's witness, George Oxreider, Sr., testified that he was a hunter of long experience, had hunted deer with appellant or with parties of which the appellant was a member since 1941 with the exception of a year or two during the war. The witness was then asked the following question on his direct examination: "Q. What is the fact, Mr. Oxreider, as to whether or not Mr. Lewis is careful as a hunter and in the use of a gun?"

The trial court sustained the state's objection that this question was immaterial and irrelevant. Appellant then made the following offer of proof which was refused by the trial court:

"The defendant offers to prove by this witness now on the stand that the reputation of the defendant, general reputation, in the exercise of the sport of hunting was that of a careful and prudent individual, and that this witness, if permitted to testify, would testify that he had hunted many, many times with the defendant, and that the defendant was careful in the handling and use of firearms."

Appellant argues that the proffered testimony had a direct bearing on the traits and characteristics of the appellant involved in the charge on which he was being tried and should have been submitted to the jury for its consideration in determining whether or not at the time

charged in the information the appellant was careless or negligent or failed to use ordinary caution under the circumstances.

In support of this argument appellant quotes from the Oklahoma case of *Henderson v. State,* 59 Okla. Crim. 86, 56 P. (2d) 915, in which the defendant in a homicide case pleaded self-defense and the court permitted him to produce evidence as to his being a peaceable, law-abiding citizen.

█ The rationale of that case is not applicable here. Under the instructions given to the jury by the trial court in this case, the issue was whether the appellant was negligent and careless at the time he fired his rifle. The testimony offered had no bearing upon this issue, since the fact that appellant was careful in the handling of firearms on other occasions did not tend to prove that he was careful when he fired the shot which killed Mrs. Packer. *Rossier v. Payne,* 125 Wash. 155, 215 Pac. 366.

The other cases cited by appellant involve a different type of crime in which the commission of the act charged was in issue. Here appellant admitted firing the fatal shot and the testimony offered was immaterial for the reason already stated. The trial court did not err in refusing to admit this testimony.

Appellant's second and third assignments of error are that the trial court erred in communicating with the jury in the absence of appellant after the case had been submitted to it for decision and erred in failing to give the jury an additional instruction clarifying instruction No. 9 when requested by the jury.

Affidavits of three of the jurors submitted in support of appellant's motion for a new trial show that, after the jury had retired to the jury room to deliberate, the members were unanimously agreed that the deceased was dressed improperly to be in the woods. These jurors further stated that, through the foreman, they requested further instructions from the court as to the dress of the deceased and what effect such dress would have upon the negligence of the defendant (appellant). In addition, they requested a copy of the 1949 game laws.

In order to understand these two assignments it is necessary to refer to the evidence relative to the nature of the clothing worn by Mrs. Packer at the time of her death. This clothing was admitted in evidence and was described by several witnesses.

According to this testimony, Mrs. Packer was wearing a red felt hat and a checkered jacket with red, tan and black squares (which was buttoned at the time of the accident). Underneath the jacket was a white garment designated as a T shirt. She had on a pair of blue jeans.

By instruction No. 9 the jury were told that, in determining whether appellant was negligent and careless at the time of the shooting, they should take several factors into consideration including "the conduct of the deceased before and at the time of the alleged killing" and "all other facts and circumstances bearing upon the conduct of the defendant and [the] deceased that is properly in evidence before you."

The bailiff in charge of the jury stated in her affidavit:

". . . that affiant was advised that the jury desired further instructions and a copy of the game laws, that affiant advised the jury to write a note which would be delivered to the court, that a few minutes later a member of the jury handed to affiant a note which was promptly delivered to the judge in his chambers, that affiant was advised by the Judge that the jury had been fully instructed and that no further instructions would be given and this message was conveyed to the jury by affiant, and at no other time at said time said jury was deliberating was any other request made by the jury for further instructions."

In another affidavit in support of a motion for a new trial, the attorney for appellant averred:

"That after the case went to the jury during the late afternoon or early evening of Friday, April 7th, 1950, and while the jury was deliberating, affiant was about to enter the Stevens County Law Library adjacent to the court room, in the Stevens County Court House, affiant observed the bailiff who was in charge of the jury hand a note, which was on yellow paper to His Honor Judge C. A. Pettijohn, and Judge Pettijohn turned to me and stated in words to

the effect that the jury had requested a copy of the 1949 Game Laws, but no mention was made to me at that time, or at any other time, that the jury had requested further instructions, or any explanation or clarification of Instruction No. 9, and in fact if the bailiff conveyed the request of the jury to the Judge for further instructions, the court overlooked calling it to affiant's attention.

"That when the court advised affiant that the jury requested a copy of the 1949 Game Laws, affiant remarked that he did not believe it would be proper to give to the jury the Game Laws, inasmuch as it was the function of the court to instruct the jury as to the law of the case."

No claim of error is predicated upon the trial court's refusal to furnish the jury with a copy of the 1949 game laws.

■ It is the position of the appellant that the message of the trial judge communicated to the jury, through the bailiff, to the effect that the jury had been fully instructed, constituted a communication between judge and jury outside the presence of the appellant and his counsel in violation of Rem. Rev. Stat., § 352 [P.P.C. § 99-57], which provides as follows:

"After the jury have retired for deliberation, if they desire to be informed of any point of law arising in the case, they may require the officer having them in charge to conduct them into court. Upon their being brought into court, the information required shall be given in the presence of or after notice to the parties or their attorneys."

The negative reply made by the court to the jury's request in the manner described in the affidavits above referred to did not violate the statute relied upon by appellant. This court so held in a similar case. In *State v. Colson*, 9 Wn. (2d) 424, 115 P. (2d) 677, the jury while deliberating asked the court through the bailiff: first, for an almanac, second, to have certain testimony read to it and, third, whether it could recommend leniency. The court answered through the bailiff "No" to the first two requests and that the court could not answer the third question. In holding the conduct of the trial court not to be reversible error, we said:

"As appears from the court's statement, it did nothing more, when the bailiff informed it of the questions asked by the jury, than to answer them in the negative. As to the first and the second questions, the court simply said, 'No,' and this answer was communicated to the jury. As to the third, with reference to whether the jury had a right to recommend leniency, the court merely wrote on the note the jury sent it that it could not answer that question. By this, of course, the court did not mean that it did not know the answer, but that it would be improper for it to make any statement to the jury with reference thereto. However, the jury did attach a slip to the verdict, in which they recommended leniency.

"It will be observed that all of the answers the court made were negative in character, as above stated, and that no affirmative information was conveyed to them. It may be that, in certain instances, a negative answer may convey an affirmative thought, but, if so, the answers of the court in this case would not have that effect.

"When the inquiries were made by the jury, the court could not very well refuse to make any reply and thus ignore the jury entirely. The appellant argues that, when the inquiries were made, the jury should have been called into the courtroom, the defendant brought in, and his counsel notified. It is said that this would have given the defendant's counsel an opportunity to argue to the court that the almanac was admissible, and that the jury should have had the testimony read to them. Such a procedure would have been impractical and confusing, even though it be admitted that, so far as the reading of the testimony was concerned, the court might have permitted it, in the exercise of its discretion."

Referring to the alleged refusal of the court to give an additional instruction, the affidavits do not show that the trial court was ever presented with a request for a clarification of instruction No. 9. The bailiff in her affidavit stated that, upon receiving a request from the jury for further instructions and a copy of the 1949 game laws, she advised it to write a note to the court.

None of the three jurors who furnished affidavits state that *any* note was written by the foreman to the trial judge. The bailiff says she delivered to the judge in his chambers a note which was handed to her by a member of the jury.

Appellant's counsel saw her hand a yellow slip of paper to the judge. There is no affidavit from the foreman of the jury as to the sending of a note to the court.

Assuming that such a note was written by the foreman and handed to the trial court through the bailiff, there is nothing in the record as to the note's contents. No juror submitted an affidavit as to its contents nor did the trial judge reveal in any manner whether it contained a request from the jury for a clarification of instruction No. 9 as to the effect of the deceased's dress upon the question of appellant's negligence. In the minutes of the trial court, dated May 19, 1950, we find the following:

"Mr. H. Earl Davis argued his motion for arrest of judgment and his motion for a new trial. The Court answered Mr. Davis's argument on instructions No. 9, also the duty of the Court when the jury requested further information."

In the absence of a statement of the trial court, this court has no means of ascertaining whether the trial court denied the motion for a new trial because the jury never wrote the alleged note or whether, if one was written, that it contained only a request for the 1949 game laws and none for a clarification of instruction No. 9.

Under this state of the record we must assume that no request from the jury for a clarification of instruction No. 9 was received by the trial court.

Finding no reversible error in this record, the judgment and sentence is hereby affirmed.

BEALS, ROBINSON, SCHWELLENBACH, and HILL, JJ., concur.

———————

March 1, 1951. Petition for rehearing denied.